IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 331 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| DANIEL RANKINS | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Daniel Rankins' motion to suppress evidence [36]. For the reasons set forth below, Defendant's motion is denied.

**I. Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). In this case, the Court conducted a suppression hearing on February 11, 2014, during which counsel for the Government presented the testimony of Special Agent Craig Henderson and counsel for Defendant presented the testimony of Megan Hammond, a gas station attendant who witnessed Defendant's encounter with federal agents. After considering the testimony of the witnesses and assessing their opportunity to observe and hear the events as they unfolded, and their credibility, the Court sets forth the following recitation of the facts surrounding the encounter between Defendant and federal agents that gave rise to the motion to suppress currently before the Court.

1

On January 7, 2013, FBI agents conducted an undercover operation to investigate a suspected bankruptcy fraud scheme believed to be operating in or near the City of Chicago Department of Revenue. Federal agents believed that the scheme went something like this: Car owners whose cars had been towed and impounded by the City would go to the Department of Revenue to pick up a "hot desk sheet," which is a bill showing the fines and fees that must be paid to retrieve an impounded car. Individuals participating in the suspected scheme would intercept car owners who had picked up a "hot desk sheet" but not yet paid its enumerated penalties. The schemers would tell the car owners something to the effect of, "For a certain price we can get your car out without you having to pay the City fines and fees." If a car owner was interested, and paid the schemers their requested fee, the schemers would help him or her prepare and file a federal bankruptcy petition listing the City of Chicago, the Department of Revenue, and the impound lots as creditors. After filing the petition and triggering the operation of the "automatic stay" against the named creditors, see 11 U.S.C. § 362, the car owner would return to the Department of Revenue, present the bankruptcy paperwork, and retrieve the impounded car without paying the City-assessed fees and fines listed on the "hot desk sheet."

On January 7, 2013, Agent Henderson and other federal agents "looking to develop the subjects of the investigation" conducted surveillance near the Department of Revenue building at 400 West Superior Street. The surveillance began around 9:15 a.m. The agents ran the license plates of a white Chevrolet that they saw leaving the Department of Revenue at about 10:00 a.m. and learned that the white Chevy was registered to Defendant. At some point "early on" in the surveillance, the agents observed and took photographs of several people standing outside the Department of Revenue. Defendant was among those photographed.

As part of the operation, an undercover agent ("UA") wearing a concealed recording device and carrying $600 in prerecorded, government-provided cash went into the Department of Revenue building with the hopes that someone would solicit him to take part in the suspected scheme. The UA's recording device did not operate a live feed to the surveillance team outside, so the UA periodically telephoned the team to keep them apprised of goings-on inside the building. At around 2:40 p.m., the UA informed the rest of the surveillance team that he had been solicited to take part in the suspected bankruptcy scheme. The UA further advised that he had paid the $600 in cash to a man who was driving the white Chevy registered to Defendant.

At around the same time, Agent Henderson observed the white Chevy exit the parking lot at the southwest corner of West Chicago Avenue and North Sedgwick Street. Defendant was the driver and sole occupant of the car. Agents observed the Chevy pull into a Shell gas station at the northwest corner of West Chicago Avenue and North Orleans Street. Defendant parked the car at a gas pump about 20-25 feet away from the gas station mini-mart, got out of the car, and went into the mini-mart. The clerk, Megan Hammond, testified that Defendant asked her to put $10 on the pump. While Defendant was in the mini-mart, Agent Henderson and Agent Brackins pulled into the gas station and parked their unmarked vehicle directly behind Defendant's car, facing in the same direction. The witnesses agree that two additional federal agents arrived at the gas station at some point. The Court credits Agent Henderson's testimony that there were at least three unmarked FBI vehicles on the scene. (Ms. Hammond testified that she saw only two: "a big van" and "a smaller sedan.") According to Agent Henderson, one of the vehicles was parked on the opposite side of the pump from Defendant's car; the vehicle was parallel to Defendant's, with the pump in between the two cars. It is not clear from the record where the third vehicle was parked.

Agents Henderson and Brackins approached Defendant when he exited the mini-mart. Both agents were dressed in plainclothes. Both were armed, but neither had his weapon drawn. Agent Henderson was on one side of Defendant, and Agent Brackins was on the other. Agents Henderson and Brackins identified themselves as FBI agents and told Defendant that he was being detained but was not under arrest. It is unclear which agent told Defendant that he was being detained; Agent Henderson testified primarily in terms of "we." It also is unclear when precisely the other two agents joined the trio near Defendant's car. Agent Henderson testified that they "showed up" "a minute or two later," or "a minute or so" after Agents Henderson and Brackins initially approached Rankins, but also stated that "there were two other agents out there at the time" of the initial approach. According to Ms. Hammond, who testified that she could "see everything" from her vantage point in the mini-mart, notwithstanding the advertisements hanging in the windows, but could not hear any portion of the encounter, "four guys came out of each – combined in both cars and started to arrest the guy." For the purposes of this motion, the Court will assume that all four agents were on the scene from the moment that Agents Henderson and Brackins approached Defendant.

According to Agent Henderson, he or one of the other agents instructed Defendant to put his hands on his car. "We" placed handcuffs on Defendant, and Agent Henderson performed a pat-down search. The search turned up Defendant's cell phone and car keys, which agents removed from his possession and placed on the exterior of his car. Agent Henderson also felt and recovered two "wads" of cash: $600 from one of Defendant's pants pockets and $760 from the other. The agents compared the cash to photocopies of the money that had been issued to the undercover agent and determined that the $600 was the same $600 that had been in the UA's possession earlier that day. Agent Henderson seized the $600 and gave Defendant a receipt for

it. Because the agents were unable to determine the origin of the $760, they returned that money to Defendant at the scene. The agents did not advise Defendant of his *Miranda* rights.

After Defendant was handcuffed and patted down, the agents asked him to identify himself; they had not found any identification during the search of his person. Defendant told the agents that his name was Daniel Devon Rankins. The agents ("we") then told Defendant that they "were investigating this" and believed that he had been paid $600 by the UA in exchange for facilitating the filing of a fraudulent bankruptcy petition. According to Henderson, Defendant responded, "I did it."

The agents then asked Defendant if they could search his car. Defendant, who was still handcuffed and standing outside the car, verbally agreed to the search. Defendant did not complete a written consent form. Two agents stood at Defendant's sides while the other two agents searched his car. The car search turned up a flyer advertising services to get vehicles out of the City impound lot.

After the car search, while Defendant was still handcuffed, the agents (again, "we") "asked him if he would cooperate." Agent Henderson testified that Defendant agreed to cooperate with the agents. The testifying witnesses offered competing accounts of what happened next. Agent Henderson testified that after Defendant agreed to cooperate, while he was still near his car, "[a]t that point we unhandcuffed him, advised him again that he was free to leave and that he was not under arrest and then we escorted him to one of the agents' vehicles." Agent Henderson further testified that Agent Hart pulled his car in, lights forward," into "like a trash bin area and a little pull-in area," and "then we entered the vehicle." Agent Henderson was "not sure" how Defendant got into the car, but did not recall personally putting him in. According to Agent Henderson, Defendant "made it clear that he wanted to cooperate" again

after the cuffs were removed, and was given his cellphone back around that time. Defendant did not receive his keys, however, until he was inside the sedan, "after his vehicle was moved from the pump by one of the agents." Ms. Hammond testified that Defendant remained handcuffed upon leaving the gas pump and that the agents "walked him over to the other spot," which was a "handicapped parking spot where the small sedan was parked," near the front of the mini-mart but off to one side, toward an alley-type area containing a trash dumpster. She stated that the agents then "put [Defendant] into the smaller sedan," but agreed on cross-examination that she did not see agents "put their hands on the defendant's head to get him in the car," and that Defendant "just got in" to the car. Ms. Hammond stated that she did not see any of the agents "moving the other cars around."

As noted above, the witnesses at the suppression hearing differed on their recollection of when the agents removed Defendant's handcuffs. Agent Henderson clearly had a better vantage point, but the absence of any details in regard to which agent in particular handled the cuffing and uncuffing leaves his testimony less persuasive than it might otherwise have been on that point. Ms. Hammond, who on the whole was a credible witness, recalled that the cuffs remained on Defendant as he walked away from the gas pump and toward the sedan. But her somewhat restricted opportunity to observe the interaction while inside the store and attending to her job-related duties gives the Court pause in regard to relying too heavily on her testimony of what she saw, particularly as the subjects moved further away from the counter where she was standing. In that same vein, Ms. Hammond acknowledged that she did not see the agents remove the handcuffs from Defendant and only "assumed" that they did so while he was in the sedan. On balance, the Court finds Agent Henderson's recollection as to when the agents removed the handcuffs more reliable given his superior vantage point and direct involvement in the

interaction. Agent Henderson also credibly testified that Defendant was not handcuffed at any time inside the car, and his testimony on that score squares with the undisputed testimony about the tone and content of the conversation in the sedan and the testimony that Defendant reviewed photos with the agents and took calls on his cell phone.

Ms. Hammond and Agent Henderson agreed that Defendant was seated in the back seat of the sedan, which Agent Henderson explained they sat in because "the car was heated and it was someplace we could sit down." Agent Henderson testified that he sat next to Defendant, Agent Hart sat in the driver's seat, and Agent Anderson sat in the front passenger seat. Agent Henderson did not recall the doors to the sedan being locked. Agent Brackins, who had arrived on the scene with Agent Henderson, sat in one of the other vehicles.

It is undisputed that the agents did not advise Defendant of his *Miranda* rights before or during his time in the sedan. While Defendant was in the sedan, Agent Henderson testified, "we discussed the matter at hand involving the fraud investigation, that we certainly were looking for cooperation." Agent Henderson conceded that the agents questioned Defendant while he was in the sedan, though Agent Henderson characterized the situation not as "an interrogation" but rather as "an interview of an individual we wanted to cooperate with us." Agent Henderson (and possibly one or more other agents) showed Defendant some photographs of individuals believed to be participating in the scheme. Defendant also provided the names of individuals that the agents did not know about and made incriminating statements about his own involvement in the scheme. Agent Henderson estimated that the encounter in the car lasted between 45 and 60 minutes, in addition to the approximately five minutes that they had spent outside Defendant's car; Ms. Hammond estimated the duration of the entire gas station encounter at "about 30, 45 minutes." The conversation in the sedan was not audio or video recorded. The agents took notes

7

but did not provide Defendant with a copy of the report or allow him to review his statements. Ms. Hammond testified that two agents came into the mini-mart to use the restroom while Defendant was in the sedan.

Defendant received "a couple of" calls on his cell phone while he was in the sedan. After taking one of the calls, Defendant told the agents that he had to pick up his son at school. The agents told him that they would give him a call the next day; they wanted to discuss arrangements for Defendant to record telephone calls with other participants in the suspected fraud scheme. Defendant agreed that he would be willing to do that and exited the sedan holding some papers. Before he left the gas station, Defendant went back into the mini-mart to purchase $5 worth of gas. Defendant left the gas station in his own vehicle after refueling it. The agents remained in their respective vehicles for a few minutes before also leaving the scene.

## II. Analysis

Defendant argues that the evidence that the agents acquired at the gas station – namely, the $600, the flyer, and his incriminating statements – should be suppressed because all of it was obtained in violation of his Fourth and/or Fifth Amendment rights. As to the $600, Defendant contends that the agents lacked reasonable suspicion that he was armed and presently dangerous and thus exceeded the bounds of the Fourth Amendment by patting him down and seizing the funds. The Government responds that the agents had probable cause to arrest Defendant when they approached him at the gas station, and therefore that they were authorized to conduct a full search of Defendant to protect themselves and recover evidence. The Government argues in the alternative that even if the agents lacked probable cause, they seized the $600 during a lawful *Terry* stop and frisk. As to the flyer, Defendant contends that any consent to search the car was tainted by the improper frisk and was not a product of his independent free will. The

8

Government responds that Defendant's consent was voluntary, was not tainted because the frisk was permissible, and was not required in any event under the automobile exception to the Fourth Amendment. Finally, Defendant contends that his statements – both the "I did it" near the gas pump and the statements that he made to agents in the sedan – should be suppressed because he was subjected to custodial interrogation without first receiving *Miranda* warnings. The Government concedes that Defendant was in custody when he was near the gas pump but asserts that he was not being interrogated at that time. As to the statements in the sedan, the Government does not dispute that Defendant was interrogated but contends that *Miranda* warnings were not necessary because he was not in custody.

### A. The Pat-Down and Seizure of the $600

Defendant contends that the pat-down search, which led to the discovery and seizure of the $600, was an unconstitutional *Terry* frisk. Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), officers may stop and briefly detain a person for investigative purposes if they have reasonable suspicion supported by articulable facts that criminal activity may be afoot. See also *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[T]o proceed from a stop to a frisk, the officer 'must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.'" *Huff v. Reichert*, 744 F.3d 999, 1009 (7th Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). Defendant contends that the agents who patted him down had no reason to think that he was armed or dangerous, because bankruptcy fraud is not an inherently dangerous crime that "by [its] very nature [is] so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007). Defendant also notes that by the time of the pat-down, he had spent more than an hour in close quarters with the UA "and

there is no evidence that he made any threats, possessed any weapons, or was in any way suspected of being armed and dangerous." [36] at 12. The test for reasonable suspicion is an objective one, *Barnett*, 505 F.3d at 639; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Whether the agents objectively could have believed that Defendant was armed and dangerous is an interesting question on the record before the Court. However, "[i]t is hard to see why that matters, given the probable cause for his arrest." *United States v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004). "[P]olice who make an arrest on probable cause do not need person-specific suspicion that the suspect is carrying something dangerous." *Id.* "[A] person stopped on probable cause may be searched fully, while a person stopped on reasonable suspicion may be patted down but not searched." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc).

"Probable cause exists when 'the facts and circumstances within [the officers'] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense.'" *Huff*, 744 F.3d at 1007 (quoting *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007)); see also *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). "The probable cause inquiry is an objective one; an officer's subjective motivations do not invalidate a search otherwise supported by probable cause." *Huff*, 744 F.3d at 1007. "Whether a police officer acted on probable cause is determined based on the common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Villegas*, 495 F.3d 761, 770 (7th Cir. 2007) (quotation omitted).

Here, one of the agents who stopped and searched Defendant at the gas station credibly testified that he had observed Defendant standing outside the Department of Revenue. The Court also found credible Agent Henderson's testimony that the UA had informed him that Defendant (1) solicited the UA to partake in the suspected bankruptcy fraud scheme and (2) accepted $600 in government funds in exchange for assisting the UA with a fraudulent bankruptcy filing. Accordingly, the Court concludes that the agents had probable cause to believe that Defendant had engaged in bankruptcy fraud at the time that they stopped him at the gas station, *cf. United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) (discussing the collective knowledge doctrine), and therefore were constitutionally permitted to arrest Defendant and search him incident thereto. See *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008).

And at its inception, the encounter at the gas station certainly restrained Defendant in a manner commensurate with an arrest. "A seizure rises to the level of an arrest 'when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 719 (7th Cir. 2013) (quoting *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003)). The Government "agrees" that Defendant was "'in custody' when the agents initially stopped and detained him: he was in handcuffs, he was told that he was being investigated for bankruptcy fraud, and, at that point, he was not free to leave." [38] at 16, 20; see *Monroe v. Davis*, 712 F.3d 1106, 1115 (7th Cir. 2013) ("Although placing an individual in handcuffs does not invariably signal that he is under arrest, there can be little doubt that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody." (quotation and citation omitted)); *cf. United States v. Stewart*, 536 F.3d 714, 720 (7th

Cir. 2008) ("[A] suspect is in custody when a reasonable person would not have felt free to leave."). According to the testimony adduced at the hearing, the agents approached Defendant, introduced themselves as agents, and told him that he was being "detained." They handcuffed him, patted him down, and confiscated his cell phone and car keys. On these facts, the Court concludes that Defendant was not free to leave and therefore was under arrest, notwithstanding the agents' assurances to him that he was not. See *Jackson*, 377 F.3d at 717 ("The officer's language does not change the facts, however: there was probable cause to believe that Jackson had committed a crime, and he was (reasonably) taken into custody. It does not matter for current purposes what label the officer applied on the scene.").

   B.   **Search of Defendant's Car**

After Defendant was handcuffed and the agents had told him that they believed that he had been paid $600 by the UA in exchange for facilitating the filing of a fraudulent bankruptcy petition, the agents asked him if they could search his car. Agent Henderson credibly testified that Defendant "gave his verbal consent to search the vehicle." Two agents searched the car while two others stood on either side of Defendant. Ultimately, the agents recovered from the car a flyer advertising services to get vehicles out of the impound lot. Defendant contends that the flyer should be suppressed because it was a fruit of the illegal *Terry* frisk. He contends that "the FBI agents exploited the illegality of the *Terry* frisk to obtain Mr. Rankins' consent to search his vehicle." [36] at 14; see also [46] at 3 ("Alternatively, in the event that the Court concludes that the initial encounter with Mr. Rankins was a *Terry* stop that ripened into a custodial interrogation, the $600 in pre-recorded government funds recovered from Mr. Rankins during the unlawful *Terry* frisk and the flier retrieved as a result of that tainted frisk must also be suppressed.")

Defendant's argument is predicated on the conclusion that the search of Defendant was an illegal *Terry* frisk. Because the Court concludes, however, that the search was supported by probable cause, this argument cannot carry the day. Defendant does not challenge the voluntariness of his consent more generally. See generally [36]; [46]. Accordingly, the Court cannot conclude that his consent was invalid. Moreover, even if Defendant did not consent to the search, the Supreme Court held in *Arizona v. Gant*, 556 U.S. 332, 351 (2009), that "[p]olice may search a vehicle incident to a recent occupant's arrest * * * [if] it is reasonable to believe the vehicle contains evidence of the offense of arrest." Here, the agents had probable cause to arrest Defendant on suspicion of bankruptcy fraud. They had observed Defendant's car come and go from the Department of Revenue, and knew that the UA's transaction with Defendant had happened recently. Under these circumstances, it was reasonable for the agents to believe that there might be some evidence related to the suspected scheme – such as bankruptcy forms – in the car. Because it was permissible for the agents to search the Chevy with or without Defendant's consent, the Court denies the motion to suppress the flyer.

## C. Defendant's Statements

After they handcuffed and searched Defendant, the agents told Defendant that they believed that he had been paid $600 by the UA in exchange for facilitating the filing of a fraudulent bankruptcy petition. Defendant then stated, "I did it." Later, after the agents recovered the flyer, they asked Defendant if he would cooperate with them. After Defendant agreed to do so, the agents removed his handcuffs, returned his cell phone but not his keys, and told him that he was free to leave. Once Defendant reiterated his willingness to cooperate, the agents "escorted him to one of the agents' vehicles," the sedan parked near the dumpster. Defendant sat in the car with three agents for at least 45 minutes, during which time he made

numerous incriminating statements. Defendant contends that all of his statements should be suppressed because he was under custodial interrogation but was not provided with *Miranda* warnings. The Government's position is that Defendant never was both in custody and under interrogation simultaneously. It concedes that Defendant was in custody at the time that he said, "I did it," but argues that the statement was made spontaneously and was not a result of interrogation. Conversely, the Government concedes that Defendant was interrogated in the sedan but disputes that he was in custody at that time.

The Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966), was designed to safeguard the constitutional guarantee against self-incrimination enshrined in the Fifth Amendment. *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011). Under *Miranda* and its progeny, an individual must be warned prior to questioning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "The four warnings *Miranda* requires are invariable, but [the Supreme] Court has not dictated the words in which the essential information must be conveyed." *Florida v. Powell*, 559 U.S. 50, 60 (2010). In order for the agents' obligation to issue *Miranda* warnings to be triggered, however, an individual must be both "in custody" and subject to "interrogation." *United States v. Johnson*, 680 F.3d 966, 973 (7th Cir. 2012).

"A suspect is in custody for purposes of *Miranda* if, based on a totality of the circumstances, a reasonable person in the suspect's position would not have believed he was free to leave." *Johnson*, 680 F.3d at 973-74. A number of factors bear on the determination of whether a person should be considered "in custody," including whether the encounter occurred in a public place; whether the person consented to speak with the officers; whether the officers

advised the person that he was not under arrest; whether the person was moved to a different area; whether there was a threatening presence of several officers or a display of weapons or force; whether the officers deprived the person of items needed to depart; and the tone of the officers' voice. *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). "To constitute custodial interrogation, a police officer's words or actions must be reasonably likely to elicit an incriminating response." *Johnson*, 680 F.3d at 974 (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Interrogation need not take the form of a question. Statements or actions by the police "other than those normally attendant to arrest and custody" may be considered the "functional equivalent" of interrogation if the police should know that they are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Both the context and the content of the officers' statements are important. See, *e.g.*, *United States v. Henley*, 984 F.2d 1040, 1043 (9th Cir. 1993); *United States v. Martin*, 238 F. Supp. 2d 714, 719 (D. Md. 2003). However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. Thus, if a defendant makes a statement in response to words or actions by officers that do not constitute interrogation, or if he initiates communications, the officers are not prohibited from "merely listening" to his voluntary statement. *United States v. Jones*, 600 F.3d 847, 855 (7th Cir. 2010).

The Government contends that Defendant's statement "I did it" was a voluntary one. "A statement is voluntary if, 'in light of the totality of the circumstances, [it] is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). Here, nothing in the record indicates that Defendant's statement was the

15

product of abuse, intimidation, or deceptive interrogation tactics. The agents confronted Defendant with their suspicions about his involvement in the scheme and confiscated the $600, but "[m]erely reciting the evidence against a suspect is not the functional equivalent of an interrogation." *United States v. Johnson*, 680 F.3d 966, 977 (7th Cir. 2012) (collecting cases); see also *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (holding that an officer's statement regarding the evidence and the possible consequences of the charges the defendant faced did not amount to interrogation, and noting that the provision of such information may contribute to the intelligent exercise of judgment regarding what course of conduct to follow); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995). But see *United States v. Ambrose*, 668 F.3d 943, 955-56 (7th Cir. 2012) (concluding that an interview "was an interrogation for *Miranda* purposes because [the interviewing officers] should have known that confronting Ambrose with evidence of his guilt was likely to elicit an incriminating response"). They did not ask Defendant for his cooperation before that time, or otherwise prompt him to give up the ghost. On the record before it, the Court cannot conclude that the agents' provision of information to Defendant, "even if its weight might move a suspect to speak, amounts to an impermissible 'psychological ploy.'" *Johnson*, 680 F.3d at 978 (quoting *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006)); see also *Arizona v. Mauro*, 481 U.S. 520, 529 (1987). Accordingly, the Court concludes that Defendant was not under "interrogation" for *Miranda* purposes when he stated, "I did it." Defendant's motion to suppress this statement is denied.

Defendant's motion regarding the statements in the sedan presents a closer question. As a threshold matter, the Court concludes that the agents did not engage in "custodial interrogation" when they broached the subject of the Defendant's possible cooperation. As noted above, both content and context are significant in assessing the agents' statements. In regard to

content, the agents asked if Defendant would be interested in cooperating and may have suggested that in doing so he might help himself.[1] Placing those statements in the context of Defendant's awareness of the information already known to the agents and his own substantial experience with law enforcement – more than three dozen arrests, by the Government's count – the Court cannot conclude that the agents' inquiry about cooperation was "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301, particularly where there is no indication that the agents told Defendant that they would pass along word of his cooperation to the prosecutor or judge. Contra *Killebrew v. Endicott,* 992 F.2d 660, 663 (7th Cir. 1993). Instead, the information provided by the agents about their observations earlier that day "contribute[d] to the intelligent exercise of judgment regarding what course of conduct to follow," *Easley*, 433 F.3d at 974, and their overture about cooperation sought to elicit either a "yes" or a "no" response, neither of which standing alone would be incriminating. See *Enoch*, 70 F.3d at 1500.

Once Defendant entered the back seat of the sedan, however, the Government concedes (as it must) that Defendant was under "interrogation." It contends that he was not "in custody," however, because the totality of the circumstances indicates that he was free to terminate the encounter and leave. Many factors bear on whether an individual is free to leave, see *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012), and upon careful consideration of the testimony and evidence presented, most of those factors indicate that Defendant was not "in custody" while he was in the sedan. Although Defendant was outnumbered by the agents, the entire encounter took place in a public gas station parking lot. Defendant consented to speak with the plainclothed agents, both before and after his handcuffs were removed, and he

---

[1] The Government's brief states that the agents "were asking for his help and his cooperation and explaining that he could help himself." [38] at 25. Agent Henderson did not testify to making such a statement, but on cross-examination he noted that one of the intended purposes of stopping Defendant at the gas station was "to give Mr. Rankins an opportunity to not only help us but potentially down the line if he was charged, help himself out." Tr. 41, Feb. 11, 2014.

repeatedly was advised that he was not under arrest. See *United States v. Littledale*, 652 F.3d 698, 702 (7th Cir. 2011). Defendant was moved to a different area when he walked to the sedan, but it was mere feet away, publicly visible, and a relatively comfortable place to carry on a lengthy conversation in January. See *id.* Ms. Hammond testified that she could see the sedan from inside the gas station, saw Defendant in the backseat by a window, and saw him exit the car, uncuffed, at the end of the encounter. She also credibly testified that two agents entered the mini-mart while Defendant was in the sedan. This necessarily means that at least one agent left the sedan at some point during the conversation, which supports Agent Henderson's testimony that he did not recall the doors being locked.

Moreover, there is no credible evidence that Defendant went to the sedan against his will, remained handcuffed while therein, or was in any way restrained or prevented from exiting the car or leaving the scene. The record indicates that Defendant and the agents all remained calm and measured throughout the entirety of the encounter, that the agents allowed Defendant to use his cell phone while he was in the sedan, and that his keys were returned to him once agents moved his car away from the gas pump. In short, the totality of the circumstances, including Defendant's termination of the encounter so that he could pick up his son from school, see *Ambrose*, 668 F.3d at 959-60, and the discussion about continuing the dialogue at a later date, indicates that Defendant was free to leave. The Court therefore finds that Defendant was no longer in custody and voluntarily cooperated with the agents when he spoke with them in the sedan.[2] See *United States v. Rivera*, 906 F.2d 319, 323 (7th Cir. 1990) (affirming district court's

---

[2] The Court's conclusion that Defendant voluntarily agreed to provide information to the agents in the sedan, understanding at that point that he was no longer in custody and free to leave if he chose to do so, is bolstered by Defendant's age (30 at the time of the encounter), prior experience with law enforcement, and understanding of the evidence that had been laid out for him by the agents in the preceding five minutes. Compare *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) (considering defendant's experience in voluntariness inquiry and expressing doubt that defendant's encounter with law

factual findings that defendant was not in custody and had voluntarily consented to speak with officers in squad car where, *inter alia*, defendant's identification had been returned to him, he had been told that he was free to leave, and the atmosphere in the squad car was not coercive).

In sum, after careful consideration of the totality of the circumstances, including the testimony presented at the hearing, and the pertinent case law, the Court concludes that the agents were not obligated to advise Defendant of his *Miranda* rights at any time during the course of their interactions with Defendant on January 7, 2013. Accordingly, Defendant's motion to suppress the statements that he made while in the sedan is denied. With that said, the Court adds that it certainly would not have been imprudent for the agents to have given the *Miranda* warnings even absent legal compulsion to do so, for if they had they could have avoided any question as to the protection of Defendant's constitutional rights and the admissibility of Defendant's statements if he elected to make any.

### III. Conclusion

For all of the reasons stated above, Defendant's motion to suppress [36] is denied.

Dated: May 14, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

enforcement officers fazed him "given his frequent-flyer status within the criminal justice system") with *United States v. Swanson*, 635 F.3d 995, 1003 (7th Cir. 2011) (noting that defendant's lack of "criminal arrest experience" weighed against conclusion that defendant voluntarily gave statements to police officers).